UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LOUIS GALARZA and OSCAR MACHICOTE,

      Plaintiffs,

v.                          Case No. 6:12-cv-805-T-33TBS

AKAL SECURITY, INC.,

      Defendant.

_____/

**ORDER**

Defendant Akal Security, Inc.'s Motion for Partial Summary Judgment (Doc. # 69), filed October 14, 2012, is before the Court.  Plaintiffs Louis Galarza and Oscar Machicote filed a Response in Opposition to the Motion (Doc. # 76) on November 22, 2013.  Akal filed a Reply (Doc. # 80) on December 16, 2013.  For the reasons that follow, the Motion is granted.

## I.   **Background**

### A.   **The Chain of Command**

The United States Marshals Service contracted with Akal Security, Inc., a for profit company, to provide security services, including armed Court Security Officers ("CSOs"), at United States Courthouses in the Middle District of Florida. (Gunn Decl. Doc. # 69-1 at ¶ 2).  The Plaintiffs in this action, Louis Galarza and Oscar Machicote, were employed by Akal as CSOs in the Orlando federal courthouse.

Both Galarza and Machicote reported to "Lead" CSOs Michael Dwyer and Gerald Crager. Lead CSOs were charged with properly staffing courts with CSOs, as well as performing administrative duties, such as running payroll. (Carger Dep. Doc. # 75-4 at 6:11-17). Lead CSOs Crager and Dwyer were supervised by Thomas Brazauskas, who is the site supervisor for the Middle District of Florida for Akal, and has been since 2008. (Brazauskas Dep. Doc. # 75-7 at 5:16-25). Brazauskas' job duties include general supervision and conducting investigations. James A. Tassone is the Contract Manager for Akal and has been in that supervisory position for courts in Alabama, Georgia, and Florida for eleven years. (Tassone Dep. Doc. # 75-14 at 4:17-25; 9:16-20). Each of the locations that Tassone supervises has site supervisors such as Brazauskas. (Id. at 5:4-20). Tassone's role is to "supervise the district site supervisors and to answer their questions regarding contractual items, to conduct investigations, assign investigations, review investigations. Basically, [to] handle all investigations for the 11th Circuit . . . [and prepare] statistical reports for all kinds of things." (Id. at 5:24-6:8). Tassone reports to the Vice President for judicial operations, Michael Francis. (Id. at 5:2-3). Janet Gunn is the Vice President of the Human Resources department at Akal.

2

(<u>Id.</u> at 57:11; Gunn Decl. Doc. # 69-1 at ¶ 3).

**B.   CSO Comp Time and Overtime**

During the relevant time, Orlando CSOs were paid by the hour and received overtime compensation for hours worked in excess of forty as those hours were entered into payroll. For instance, Galarza testified that he received overtime compensation in February, July, August, and September of 2009. (Galarza Dep. Doc. # 75-1 at 33:5-34:21).   What makes the payroll situation unique in this case is that Lead CSOs tried to avoid overtime payments by using a prohibited, unofficial, and clandestine comp time system. (Crager Dep. Doc. # 75-4 at 7:5-18).

There are many descriptions and characterizations of the comp time system in the record.   Crager testified:

> I'll start by saying that the Marshal Service was trying to keep the overtime down in our office.   If a CSO worked extra hours and its was beyond an eight hour day, if it happened towards the end of a week, they would tell me and I would give them comp time for the hours, and it wasn't reported on the payroll.   So there's only one official payroll system, but I keep a separate comp time system.

(<u>Id.</u> at 7:11-18).   Crager further stated: "I kept a ledger with each sheet to assign to each CSO, and as they earned comp time, I made a notation of what the value of that comp time was.   And then when they took comp time, I made a note of the

3

date that they took the comp time and subtracted it from their balance." (Id. at 8:10-15).

No one gave Crager authority to utilize the comp time system, and this system was prohibited by Akal's policies. (Brazaukas Dep. Doc. # at 37:1-3; Crager Dep. Doc. # 75-4 at 14:6-8; 28:18-20). Tassone testified that Akal prohibited the use of comp time for compensating the CSOs. (Tassone Dep. Doc. # 75-14 at 53:3-7). Crager indicated, "I was doing something I knew I probably shouldn't be doing, keeping comp time." (Crager Dep. Doc. # 75-4 at 40:7-8).

Crager testified that the CSOs "benefitted" from the comp time system: "In my mind, they were getting credit for it. They worked an hour for regular time.  They got their hour off.  It's time and a half.  They got their time and a half off.   In my mind, I didn't feel like I was cheating the company or the employee." (Id. at 28:12-17).

Contrary to Crager's opinion that all of the CSOs liked the comp time system, Galarza and Machicote orally complained to Crager and Dwyer about comp time on several occasions. (Galarza Aff. Doc. # 75-2 at ¶¶ 2-3; Galarza Dep. Doc. # 75-1 at 48:10-15).  Galarza indicated that he complained "between 2009, maybe 2010 somewhere." (Galarza Dep. Doc. # 75-1 at 51:20-21).

4

Contrary to Crager's testimony, Galarza and Machicote contend that their comp time did not reflect time and a half for overtime hours worked and was instead recorded as straight time. For instance, Galarza testified: "Well, if I worked three hours overtime, I was given three hours of comp time. And I felt we should have been compensated for four and a half at time and a half." (Id. at 22:21-24).

Furthermore, instead of unofficial comp time, Galarza and Machicote assert that they were entitled to time and a half compensation. (Machicote Dep. Doc. # 75-3 at 239:21-24). Galarza indicated: "I believe every time that I worked and I got overtime and I was compensated in comp time, I should have been given the opportunity, if I wanted to be paid for it, I should have been paid, which would have been at time and a half." (Galarza Dep. Doc. # 75-1 at 46:12-16).

C. **Plaintiffs' Investigation Cooperation**

Galarza described "tension" between the CSOs: "There was a lot of hatred, there was a lot of racial slurs." (Id. at 64:13-14). In 2010, Tassone personally conducted an investigation into an anonymous complaint alleging that four CSOs in Orlando (Alfred Adams, Bruce Braun, George Fiorenza, and James Lape) made inappropriate race-related comments and gestures regarding President Obama and engaged in sexually

5

offensive conduct. (Tassone Dep. Doc. # 75-14 at 62:14-63:6).[1]

Galazara and Machicote provided statements in the investigation in November of 2010, reporting that several of the CSOs under investigation displayed racist behavior and other inappropriate conduct. (Galarza Dep. Doc. # 75-1 at 55:21-56:17; Machicote Dep. Doc. # 75-3 at 22:19-23:7; 28:15-29:5). Specifically, Machicote reported that CSO Lape used a racial slur to describe the President and commented that the President "should be dead." (Machicote Dep. Doc. # 75-3 at 28:15-18). Machicote also reported that Braun "likes to put his hand on his penis and ask people if they want it." (Id. at 29:2-3).

### D.   **Investigations against Plaintiffs**

#### 1.   **Pornography**

In November of 2010, CSO Fiorenza lodged a complaint charging that Galarza showed pornography to other CSOs at work. (Doc. # 69-2 at 11, 23). The United States Marshals Service directed Gunn to investigate whether Galarza "showed pornography to other CSOs on his personal phone and also on USMS computer equipment in the CSO breakroom during the last

---

[1] Machicote hypothesized during his deposition that CSO Paul Geata authored the anonymous complaint regarding the unprofessional and race-related conduct. (Machicote Dep. Doc. # 75-3 at 26:2-13).

year and a half." (Id. at 11). Gunn explains in her declaration: "Akal is contractually obligated with the USMS to conduct investigations they request be made into allegations that CSOs may have violated Performance Standards." (Gunn Decl. Doc. # 69-1 at ¶ 17). At Gunn's direction, Brazauskas performed an investigation, which included interviewing CSOs Fiorenza, Adams, Lutrell, Braun, Lape, and Galarza. (Doc. # 69-2 at 23-25). Brazauskas authored a report containing the following "findings:"

> (a) On 11/09/10. . . CSO George Fiorenza was interviewed about the allegation that he made that recently CSO Louis Galarza had brought into the breakroom of the Federal Courthouse pornographic material on his personal I-Phone and did show this on the USMS computer to other CSO's that witnessed the pornography. They are as follows; CSO's Bruce Braun, James Lutrell, Alfred Adams, and James Lape.
>
> (b) On 11/09/10 . . . CSO Alfred Adams was interviewed about pornographic material being shown to other CSO's while on duty. CSO Adams stated that he witnessed pornographic pictures on the USMS computer that were brought in by CSO Louis Galarza via computer disc. This occurred in past months.
>
> (C0 On 11/09/10 . . . CSO James Lutrell was interviewed about pornographic material being shown to other CSO's while on duty. CSO Lutrell stated that approximately 1 year ago CSO Louis Galarza passed his I-Phone around to other CSO's with photographs of "naked women"; he also said that this happened several other times but did not see the pictures. CSO Lutrell further said that approximately 1 to 1½ years ago CSO Louis Galarza's zip drive was

plugged into the USMS computer in the breakroom and porn pictures were being viewed.

(d)   On 11/09/10 . . . CSO Bruce Braun was interviewed about pornographic material being shown to other CSO's while on duty.  CSO Lape stated that CSO Louis Galarza had downloaded pornographic pictures to his cell phone and had shown it around the breakroom to other CSO's on several occasions.  CSO Lape said he did not see this on any other devices.

(f)   On 11/09/10 . . . CSO Louis Galarza was interviewed about pornographic material being shown to other CSO's while on duty.  CSO Galarza stated that he had shown other CSO's nude photos on his I-Phone prior to being on duty maybe 2-3 times within the past 9 months.

(Doc. # 69-2 at 24).

In his deposition, Galarza admitted that he showed the pornography to other CSOs at the workplace, but disputed that he used United States Marshals Service computer equipment to do so. (Galarza Dep. Doc. # 75-1 at 79:24-83:5).

## 2.   **Time Fraud**

Shortly thereafter, in or about January 2011, Tassone "received a note on a floppy disc regarding allegations that two employees Mr. Machicote and Mr. Galarza, were leaving early." (Tassone Dep. Doc. # 75-14 at 40:10-12).  The note was anonymous. (Gunn Decl. Doc. # 69-1 at ¶¶ 15-16, 19).  On January 6, 2011, the United States Marshals Service directed Gunn to investigate whether Galarza and Machicote "committed time fraud by clocking out listing a later time and then

leaving early." (Doc. # 69-2 at 14-18). In addition, on April 21, 2011, the United States Marshals Service directed Ms. Gunn to investigate whether Machicote "abandoned his post on March 8, 2011." (Doc. # 69-2 at 20).

At Tassone's direction, Brazauskas performed the time fraud investigation for both Galarza and Machicote. (Tassone Dep. Doc. # 75-14 at 40:19-23).

### a. <u>Galarza</u>

Brazauskas interviewed Galarza and reviewed Galarza's time sheets and reports showing when Galarza's access card was used to swipe into and out of the Orlando courthouse. (Galarza Dep. Doc. # 75-1 at 90:18-91:19). Brazauskas also compared the time Galarza represented that he left work and when he actually left work. (<u>Id.</u> at 89:17-25). The comparison showed that Galarza left earlier than the time he recorded on his time sheets. (<u>Id.</u>). Galarza did not deny that he left earlier than he wrote on the time sheets. Instead, he remarked that "if you pull everybody else's timesheets, you're going to see the same results." (<u>Id.</u> at 113:23-25). After Brazauskas had finished questioning Galarza, as Galarza was walking out of the room, he told Brazauskas "this isn't fair; you need to talk with everyone. This is all comp time." (Galarza Aff.

Doc. # 75-2 at ¶ 12).    Crager was present during the interview, but did not comment on the existence of the secret comp time system. (Galarza Dep. Doc. # 75-1 at 106:3-8).

During his deposition, Galarza speculated that the person who wrote the anonymous complaint about time fraud may have been another CSO who was angry that Galarza cooperated in the prior investigation of inappropriate race-related comments about President Obama. (Id. at 62:1-64:15).

### b.   Machicote

Brazauskas also investigated time fraud allegations against Machicote, including interviewing Machicote in the presence of Crager. (Machicote Dep. Doc. # 75-3 at 50:16-22). Machicote "didn't deny anything" during the review of the discrepancies in the time records, instead, he stated that he left early due to comp time. (Id. at 52:4-19; 139:5-141:2). Once again, Crager was present and he was reviewing his comp time ledger during the deposition, be he remained silent about the comp time system. (Id.).

Machicote's handwritten statement to Brazauskas as a part of the investigation speculated that the anonymous time fraud allegation was cast against him in retaliation for providing information about other CSOs' alleged race-related comments

concerning President Obama.  Machicote also hypothesized that CSO Dorn may have made the anonymous complaint of time fraud because of Dorn's alleged jealousy regarding Plaintiffs' status as union stewards. (Id. at 36:23-37:9).

### E.   Discipline

#### 1.   Galarza

Based on Brazauskas' investigations, Gunn recommended that Galarza receive a 30-day suspension. (Gunn Decl. Doc. # 69-1 at ¶ 22).  The United States Marshals Service disagreed with the recommendation and directed Gunn to remove Galarza as a CSO. (Id. at ¶ 23).  Galarza was terminated effective April 6, 2011. (Id. at ¶ 26).

#### 2.   Machicote

Gunn reviewed Brazauskas' investigation reports and recommended that Machicote received a 15-day suspension. (Id. at ¶ 30).  The United States Marshals Service concurred with Gunn's recommendation for Machicote, and he was issued a 15 day suspension accompanied by a warning that any further misconduct could lead to termination. (Id.).

Machicote served his 15-day suspension.  However, on his first day back on the job, he was advised that Akal received an anonymous complaint alleging that Machicote was involved in

11

four separate incidents involving law enforcement investigations that he failed to report to Akal, as required by United States Marshals Service performance standards. (Id. at ¶¶ 17-18; Machicote Dep. Doc. # 75-3 at 145:1-7).

Brazauskas performed an investigation into whether Machicote failed to report that he faced two allegations of sexual misconduct, one speeding ticket, and one allegation of trespassing. (Machicote Dep. Doc. # 75-3 at 154:4-6 ("complaint of lewd and lascivious acts on a minor"); 158:24-159:2 (affidavit "alleging that [Machicote] had exposed [him]self to her and then grabbed her hand and placed it on [Machicote's] penis"); 164:2-13 (complaint for trespassing by a neighbor); 187:10-188:14 ("summons for driving 57 on a 45")).

Machicote testified that he told Crager about the speeding ticket. (Id. at 190:14-24). Machicote also testified that he told CSO Braun about being accused of sexual misconduct on a minor, and that Braun told Crager about the same. (Id. at 178:1-12). Machicote indicated that he did not report the other accusation of sexual misconduct to Akal, nor did he report the accusation of trespassing. (Id. at 161:13-16; 170:11-15). After performing an investigation, Brazauskas

12

determined that Machicote failed to adequately disclose these incidents to Akal.   Based on this investigation, Gunn "believed that Machicote was dishonest" and terminated Machicote effective November 3, 2011. (Gunn Decl. Doc. # 69-1 at ¶¶ 32-33).

## II.   **Procedural History**

On May 25, 2012, Galarza and Machicote filed a Complaint against Akal (Doc. # 1) and thereafter filed an Amended Complaint on September 19, 2012. (Doc. # 30).   Galarza and Machicote further refined their claims on October 30, 2012, with the filing of the Second Amended Complaint alleging violation of the overtime and anti-retaliation provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq. (Doc. # 39).   On November 8, 2011, Akal filed its Answer and Affirmative Defenses. (Doc. # 41). On October 14, 2013, Akal filed its Motion for Partial Summary Judgment, in which it seeks summary judgment as to Plaintiffs' FLSA retaliation claims only. (Doc. # 69).   The Motion is ripe for the Court's review.

## III.   **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R.

Civ. P. 56(a).   A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).   A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).   The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.   Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).   "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."   Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590,

14

593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981), <u>cert. denied</u>, 456 U.S. 1010 (1982).

## IV. <u>Analysis</u>

The FLSA bars an employer from discharging or discriminating against any employee "because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA]." 29 U.S.C. § 215(a)(3). To establish a prima facie case of FLSA retaliation, a plaintiff

15

must show that he (1) engaged in protected activity under the FLSA; (2) suffered an adverse employment action by his employer; and (3) a causal connection exists between the employee's protected activity and the adverse employment action. See Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000). "In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights.'" Id. (citing Reich v. Davis, 50 F.3d 962, 965-66 (11th Cir. 1995)). If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext. Id.

For the purposes of summary judgment, Akal "assume[s] arguendo, that Plaintiffs' alleged statements to LCOS Crager and Dwyer that their accrued Comp-Time was not being recorded at a rate of time-and-a-half constitutes a 'complaint' under the FLSA; and that this constitutes statutorily protected activity." (Doc. # 69 at 21). The Court agrees that Plaintiffs' complaints regarding comp time to Crager and Dwyer constitute protected activity.[2] The record also reflects that

---

[2] Galarza answered "Yes, sir" during his deposition when asked: "So when you said . . . you think you were terminated in part for complaints about comp time, the only complaint that you were referencing was the one conversation you had with Mr. Crager in which you asked him about recording comp time and time and a half." (Galarza Dep. Doc. # 75-1 at 116:6-13). Machicote also testified that "Other than that we should

16

both Plaintiffs faced an adverse employment action because they were terminated. The Court's focus, therefore, is on the prima facie element of causation.

### A.  Causation

Viewing all of the evidence in Plaintiffs' favor, the Court determines that Plaintiffs have failed to create a jury question on the issue of causation. Akal has demonstrated the complete absence of any evidence which could show that the disciplinary actions taken with respect to Plaintiffs were in any way related to protected activity under the FLSA.

The evidence shows that Gunn, Akal's Human Resources Vice President who authorized all of the relevant investigations and then determined that Plaintiffs should be terminated (and in Machicote's case, suspended and then terminated), had no knowledge that Plaintiffs complained about their pay or comp time. As stated in Miller v. Roche Surety & Casualty Co., 502 F. App'x 891, 894 (11th Cir. 2012), "an employer who does not (or should not) know an employee has made a complaint could [not] discriminate because of that complaint." Id. (alteration in original).

_____

be getting paid time-and-a-half, no, there were no other complaints." (Machicote Dep. Doc. # 75-3 at 117:6-7).

The facts presented are similar to those in <u>Banegas v. One Two Tree, Inc.</u>, No. 10:20090, 2010 U.S. Dist. LEXIS 81994 (S.D. Fla. Aug. 12, 2010), because the employees complained about FLSA violations, but not to a decisionmaker. There, the plaintiff complained about unfair wages and FLSA violations to an executive secretary and was laid off shortly thereafter. <u>Id.</u> at *14-15. The district court determined that the oral complaint to the executive secretary was protected activity, but granted summary judgment in favor of the employer on plaintiff's FLSA retaliation claim after noting that plaintiff failed to establish that the decisionmaker had knowledge of the protected activity. <u>Id.</u> at *15-16. The court explained:

> Despite the temporal proximity of Plaintiff's complaint and his termination, there is absolutely no evidence whatsoever that the decisionmaker in Plaintiff's termination, Marc Terwilliger, knew about Plaintiff's protected activity. Mr. Terwilliger testified that he did not know about the protected activity, and Plaintiff testified that he did not tell Mr. Terwilliger about his problems with his wages and that he did not know if the secretary told Mr. Terwilliger. If the decisionmaker did not know about the protected activity, there is no way that the protected activity was the "but for" cause of the termination. Therefore, Plaintiff has not shown a prima facie case of FLSA retaliation.

<u>Id.</u>

Here, both Plaintiffs testified that they complained about comp time to Crager and Dwyer only. It is undisputed

18

that Plaintiffs did not raise any FLSA issues with Gunn, the decionmaker, and Gunn filed a declaration indicating that she was not aware of Plaintiffs' oral complaints about comp time when she (1) initiated investigations against Plaintiffs and (2) terminated Plaintiffs. (Gunn Decl. Doc. # 69-1 at ¶ 13).[3]

In an effort to circumvent the requirement of decisionmaker knowledge regarding the FLSA complaints, Plaintiffs assert a "cat's paw" theory of causation. "Under this theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct." Dwyer v. Ethan Allen Retail, Inc., 325 F. App'x 755, 757 (11th Cir. 2009). In essence, Plaintiffs contend that Gunn, the decisionmaker, "rubber stamped" Brazauskas' investigations, and that Brazauskas was the real

---

[3] Machicote testified that he sent Gunn, Brazauskas, Tassone, and others an anonymous letter about comp time. (Machicote Dep. Doc. # 75-3 at 90:12-1; 93:21-24). Machicote testified that he sent the letters anonymously because "I was still an employee of Akal, there would have been retaliation if they knew it was me." (Id. at 93:11-13). It appears that, rather than making his complaints known, he anonymously complained, such that any decisionmaker in receipt of his complaint could not identify Machicote as the sender and thus could not retaliate against Machicote based on his complaint.

19

decisionmaker because he conducted the investigations that Gunn relied upon in making her employment decisions.[4]

The Court agrees that under certain circumstances, a causal connection may exist in the absence of direct decisionmaker knowledge when the termination decision is "tainted" by the retaliatory animus of a subordinate employee. See Pennington v. City of Huntsville, 261 F.3d 1262, 1270 n.5 (11th Cir. 2001). However, even if the Court were to accept Plaintiffs' argument that "Gunn simply 'rubber stamped' the investigative findings that were put together by Brazauskas" (Doc. # 76 at 18), Plaintiffs have still failed to show causation. Despite Plaintiffs' suggestion to the contrary, there is no evidence in the record to support the argument that Brazauskas was aware that Plaintiffs complained about the manner in which they were compensated - the protected activity alleged here.

During his deposition, Galarza was asked whether, prior to his termination, he ever "expressed any concerns or complaints about pay or pay systems or anything dealing with pay" to any Akal manager. (Galarza Dep. Doc. # 75-1 at 55:11-

---

[4] Gunn, located at Akal's corporate headquarters in Espanola, New Mexico, has never spoken to Plaintiffs and did not conduct any independent investigations. She based her employment decisions on Brazauskas' investigative reports. (Gunn Decl. Doc. # 69-1 at ¶¶ 3, 9, 21, 30, 33).

17).  Galarza responded: "Not that I can recall." (Id. at 55:18).  Galarza also filed an affidavit in which he avers that, during his time fraud investigation, he mentioned "comp time." (Doc. # 75-2 at ¶ 12).  Plaintiffs also point the Court to various investigative documents from Brazauskas, which mention comp time.  (See, e.g., Doc. # 76-6 at 8).[5]  In addition, during his deposition, Machicote testified that Brazauskas "knew all about" comp time "but refused to acknowledge it." (Machicote Dep. Doc. # 75-3 at 43:13-15). Machicote also testified that Crager told him that Brazauskas knew about comp time. (Id. at 89:6-8).  However, Brazauskas' alleged awareness of the existence of an unauthorized comp time system does not equate to Brazauskas' awareness that Plaintiffs complained about the comp time system or the way the comp time system affected their compensation.

Without knowledge of any FLSA protected complaint, Brazauskas could not have retaliated "because of" such alleged complaint. See Brungart v. BellSouth Telecomms., 231 F.3d 791,

---

[5] In the same investigative documents, Machicote argues that he faced "retaliation;" however, it is beyond dispute that the "retaliation" he alludes to has nothing to do with the FLSA.  Instead, during Brazauskas' investigations and during Machicote's deposition, Machicote indicated that he was being retaliated against because he previously provided information about other CSOs making racist remarks about President Obama. This alleged "retaliation" is in no way related to the FLSA.

799 (11th Cir. 2000)("A decision-maker cannot have been motived to retaliate by something unknown to him."). Furthermore, "temporal proximity alone is insufficient to create a genuine issue of fact as to casual connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." (Id.).

Bare "suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment." LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999). "Further, and significantly, mere conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment." Hansen v. Perry Techs., 206 F. Supp. 2d 1223, 1225 (S.D. Fla. 2002). Plaintiffs have not provided any evidence beyond mere speculation that Brazauskas knew that Plaintiffs engaged in any protected activity. Because Plaintiffs cannot establish a prima facie case of retaliation, summary judgment in favor of Akal is required.

## B. **Legitimate and Non-Retaliatory Reasons and Pretext**

Even assuming that Plaintiffs were able to demonstrate a prima facie case of FLSA retaliation, Akal is entitled to

summary judgment because it has articulated legitimate and non-retaliatory reasons for investigating Plaintiffs and terminating them, and Plaintiffs have not shown pretext.

The record reflects that Galarza was investigated for time fraud and for pornography. There is no evidence that the investigations were motivated by the fact that Galarza complained to Crager and Dwyer about his compensation.

After reviewing the investigation reports, Gunn recommended that Galarza be suspended for 30 days. The United States Marshals Service disagreed and required that he be terminated. Akal terminated Galarza's employment at the direction of the United States Marshals Service because he allegedly committed time fraud and admittedly showed pornography at work on more than one occasion. Gunn explained in her declaration that "the USMS contract reserved to the USMS the right at all times to determine the suitability, and thus the continued service on the contract, of any CSO. Akal is obligated to follow USMS directives to remove a CSO from serving on any USMS contract." (Gunn Decl. Doc. # 69-1 at ¶ 7).

Likewise, Gunn terminated Machicote "solely because [she] lost confidence in his ability to effectively serve as a CSO" because she "believed that Mr. Machicote had left work without

excuse on multiple occasions earlier than reflected on his sign out sheets, had walked away from his post without permission, had become confrontational, and had failed to report certain incidents to Akal." (Id. at ¶ 33). The record is devoid of evidence that the investigations taken as to Machicote and the ultimate decision to terminate him were related to Machicote's complaint about compensation to Crager and Dwyer.

While both Plaintiffs now contend that the investigations taken against them and the decisions to terminate them were based on a retaliatory motive, the Court's review of Plaintiffs' deposition testimony indicates otherwise. Plaintiffs believed that the investigations against them, which led to their respective terminations, were initiated by fellow CSOs who sought revenge because Plaintiffs cooperated in unrelated investigations into inappropriate behavior and racist or racially insensitive conduct. (Galarza Dep. Doc. # 75-1 at 62:1-64:15). In addition, Machicote testified that he believed the anonymous time fraud accusation could have been initiated by a fellow CSO due to Plaintiffs' union activities. (Machicote Dep. Doc. # 75-3 at 36:23-37:9). Any "retaliation" Plaintiffs faced at the hands of their fellow CSOs due to Plaintiffs' cooperation in unrelated investigations or

24

Plaintiffs' union activities is not FLSA retaliation.  For instance, fellow CSO Fiorenza's complaint that Galarza viewed pornography at work very well may have been motivated by the fact that Galarza cooperated in an unrelated investigation against Fiorenza and others.  However, workplace friction and animosity between certain CSOs has no relation to the FLSA or Plaintiffs' request for overtime wages.

To be certain, Plaintiffs disagree with the discipline decisions that they faced and assert that Brazauskas' investigations were flawed.  However, a termination based on a good faith belief of misconduct is legitimate, even if it is later determined that no misconduct occurred.  EEOC v. Total Sys. Serv., 221 F.3d 1171, 1176-77 (11th Cir. 2000)("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.").  Plaintiffs point to no evidence that Gunn did not honestly believe each reason for Plaintiffs' termination.  See Malewski v. Nationsbank of Fla., N.A., 978 F. Supp. 1095, 1104 (S.D. Fla. 1997)("That the plaintiff calls into question some assertions made by the defendant in support of defendant's justification is not enough.").  Further, as stated by the court in Alexander v. Fulton County Georgia, 207 F.3d 1303, 1341 (11th Cir. 2000),

"it is not the court's role to second-guess the wisdom of an employer's decision."

To show pretext, a plaintiff must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its actions that a reasonable fact finder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). Plaintiffs have not done so.

Galarza argues that "Akal failed to follow its progressive disciplinary policy . . . which can be probative of pretext." (Doc. # 76 at 24). However, Galarza has not pointed to any evidence in the record to support this bald contention. Furthermore, Akal has come forward with evidence that the United States Marshals Service called for Galarza's CSO status to be terminated. Akal was not in a position to retain Galarza as a CSO in light of the United States Marshals Service's directive.[6]

Machicote also maintains that "Brazauskas knew that the allegations of misconduct against Machicote had previously

---

[6] The Court accepts Galarza's contention that Akal potentially could have retained Galarza as an employee in another capacity. However, Galarza has not demonstrated that he requested another position with Akal, that Akal had an opening, or that Akal otherwise discriminated or retailed against him with respect to any alternative position.

26

been investigated, reported, and dismissed." (Doc. # 76 at 23).   Once again, Plaintiffs fail to direct the Court to any evidence in the record in support of this assertion.   Because Plaintiffs cannot show that Akal's articulated reasons for its employment decisions are pretextual, Plaintiffs' FLSA retaliation claims are subject to summary judgment.

**V.   Conclusion**

A party opposing summary judgment must "show specific facts exist that raise a genuine issue for trial." Dietz v. SmithKline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010). "Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment." Bald Mountain Park, Ltd. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989).

"Summary Judgment is appropriate where the moving party shows an absence of evidence to support an essential element of the non-moving party's case." Beck v. Prupis, 162 F.3d 1090, 1096 (11th Cir. 1998).   Akal is entitled to summary judgment because it has negated an essential element of Plaintiffs' claims: causation.   If neither Gunn (the decisionmaker) nor Brazauskas (the investigator) knew that Plaintiffs engaged in protected activity, neither Gunn nor Brazauskas could have retaliated against Plaintiffs based on

27

such protected activity.  Akal is entitled to summary judgment as to Plaintiffs' FLSA retaliation claims.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED**:

Defendant  Akal  Security,  Inc.'s  Motion  for  Partial Summary Judgment (Doc. # 69) is **GRANTED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>24th</u> day of February, 2014.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


Copies:  All Counsel of Record